Good morning, Your Honors, and may it please the Court. My name is Margaret Farrin. I'm from the Federal Public Defender's Office, appearing on behalf of the defendant and appellant, Angel Flores, and I would like to reserve two minutes, if I may, at the end of my argument for rebuttal. Your Honors, the primary issue in this case is whether the two LAPD officers involved had reasonable suspicion to stop Angel Flores when they stopped him on the night in question. The parties agree on the facts that they relied on to make that stop. They were the make, model, and color of a car that was possibly involved in the criminal incident. He was found 15 to 20 minutes after the incident and 1.6 miles from its last reported location near the Harbor Freeway. But about .4 miles from the incident. Well, I think we need to clarify what the incident is, Your Honor. As you read, there are several incidents. Maybe .4 miles from 14th and Pacific? 14th and Pacific, yes, but there was no car reported at 14th and Pacific. So I think the relevant incident is the incident that had a car connected to it. Well, I'm not sure it makes a difference, but why is that the case? The incident that the calls were about were the shooting, correct? Well, there were several reported shootings in different areas. I want to get to the last call, because it's only the last caller that identifies the car. That's correct. 407 West 7th Street, Your Honor, yes. And he identifies the car. Where does he say he's heard a shooting? He said that he was working security at 407 West 7th Street. He didn't see a shooting. He heard it coming from the area of 6th and Mesa, so he was not an eyewitness. Right, so he doesn't know where the shooting occurred. He doesn't know. He just heard shots. Then he saw a car depart quickly. So he says on the call, the car that I think was the shooter, he doesn't know. So I think that's an important point to emphasize. No, but I'm just trying to figure out where the – see, that caller doesn't place the incident. He just says, I heard shots coming from that direction. He identifies the area as being 6th and Mesa, and so that is actually 0.8 miles from where Mr. Flores was shot 20 minutes later, south of there. Yeah, I'm just trying factually to figure out. So, 0.8 miles. So, in other words, coming back to the basis for – Could I ask you about this call that identifies the car? Because I don't quite understand where we get the idea that that caller knew that the car was involved in the shooting. Why isn't the car just trying to escape a dangerous area where shootings are happening? I think that's a very important point, Your Honor. The reliability of this call – put aside – let's assume it's made to 911. Let's assume he's credible and he's reporting what he knows. He doesn't know if this is involved. He says, the car that I think was the shooter, it departed – it trailed me to the Harbor Freeway up – it's recorded as Daphne Street, but it's actually Gaffey Street in the map. It goes up Gaffey Street to the Harbor Freeway. He doesn't know if that car is involved in the shooting. It's not that the caller is unreliable. We don't doubt what he's saying. He just – he doesn't purport to say, I saw the people in the car do the shooting. He doesn't purport to say that. He just says, I see a car speeding out of the area. If he doesn't purport to say that, I think in Navarrete and in Terry Crespo, though, I think that is actually part of the reliability analysis. Let's assume he's being credible. Let's assume he's not anonymous. Is he an eyewitness? Is it contemporaneous? It was neither. He wasn't an eyewitness. It wasn't even contemporaneous. It was 20 minutes earlier. The earlier calls – there's four calls, if you will. Correct. Well, actually, Your Honor, there were actually even more, if you looked in the record there, indications that there were others. But the district court relies, I think, on those four. The other three, as I understand it, don't identify a car. Not at all. They identify somebody on foot. The first one identifies one male Hispanic person, 18 to 24 years old, dark pants, dark shirt. And the second caller identifies two white people, one male, one female, dark shirt, dark shorts, walking. In one of the calls, it said that a car is heard speeding away. But that's not – there's no other information about that. Do we have any information how many cars were on the road at 2 in the morning? Your Honor, the suppression exhibit 8 is video of the officers driving around before the stop. There are several cars that go by. You know, I mean, after 2 in the morning, it's not a lot of cars, but there are cars. You know, every few seconds, if several a minute, pass by the officers. There was no testimony about the traffic or any – that's the only information we have. Is there any testimony – I don't think so. I've looked in the record for this, but I want to make sure I'm right. You know, I could envision the helicopter pilot saying we got up high at 2 in the morning and there was only one car within a one-mile area and it was this one. That's not correct. Let me finish. Let me finish. But that's not in the record. Well, what it actually is in the record is the transcript of the stop. Officer Martinez says there were several cars. He's speaking with Flores. He says – Flores says, I don't know why you were on me. And Officer Martinez says, well, there were several cars we were stopping. And actually, if you look at the tape leading up to the arrest, the Exhibit 8, Suppression Exhibit 8, they stopped several. But that's not what I asked. Okay. What I asked was – listen to the question stop – was the helicopter – did the helicopter pilot identify what he saw in the area? Or the only thing I can find in the record is Martinez saying the pilot told us there was somebody here and we stopped. The helicopter pilot, as I understand, said we see a Camaro driving at 18th and Mesa. Right. Yes. Did the helicopter pilot say anything else in the record, like we're up in the air and there's only one car? No, Your Honor. There's nothing that I'm aware of in the record like that. That was my – that was the question I was asking. Okay. I'm sorry, Your Honor. Do we have any idea how common this kind of car is? We don't. We really don't. And I think it's important to talk about the Martinez case from the 10th Circuit. There was, in fact, evidence in the record that white Cadillacs were a rare sight along this stretch of freeway. Even that wasn't enough in that case. And here, you know, you have much more options for where a car could go in San Pedro as opposed to – Wasn't the Martinez case about 130 miles away? Your Honor, it was. But I think it's different here. We have a network of streets here in San Pedro versus one highway in the Martinez case between Winslow, Flagstaff, and where the car was stopped. I mean, you have one stretch of highway. You had one car going in the direction that the suspect car was driving along that same stretch of highway. It contained a person who matched the description of the suspect being a Native American male with wearing glasses. And still, that actually wasn't enough in that case. Isn't the 5th Circuit case – Jaquez? Yeah, closer to yours. I think Jaquez – I mean, the problem, I think, with the 10th Circuit case is you're 130 miles from the scene, no matter how rare those cars are. It's true. Again, slow down. Let us finish. You can answer. We have to answer the questions. But in Jaquez, the facts seem relatively close to this. Distance, time, et cetera. I think the facts in Jaquez are the most similar to the ones here. I want to also problematize the Camaro. There was no information about the make. The make model. But it was very close in time, driving, and was closer to the scene in time. I'm sorry, it was closer to the scene than here. So in Jaquez, it was 15 minutes after, but it was coming right away from the area. Mr. Flores was reported going in a different direction from where he was found, much farther away. The court in that case made special note of the fact that there was no information about the model, make, or color of the car. That's true. They do, Your Honor. But I think in the Martinez and Jones cases, they talk about make, model, and color, and theoretical possibility of being in the area is not enough. I mean, we have Jaquez. The car is right where the incident occurred, high crime area, late at night, same color. But it's 15 minutes. It's the time. Let's get back to the fourth tip in this case, the one from the people, the guy who was in the car. He says, I didn't see a shooting, but I heard some shots from somewhere away. The record's not clear to me. Does he then get in his car? What he says is yes. He's a security guard. He's abandoning his post, as close as I can tell. It's very true, Your Honor. He did that. He gets in his car, and he goes out on the street, and he leaves. He just leaves. What he says is that he leaves. He leaves his post, or wherever he is. He sees someone behind him in a gray Camaro or Challenger. Camaro, Charger, or Challenger. But they trail. How does he associate that car with the shooting? I don't know, Your Honor. There's no— He says, they followed me until we got to the freeway. Until the Harbor Freeway. He doesn't say—he says it's speeding. He says that they were speeding initially at 60 miles per hour, but then he says, they trailed me to the Harbor Freeway. I'm trying to figure out, in his tip, how he ties that car to the shooting, other than he sees it in close proximity to the time of the shooting, then he hears the shots. That appears to be all it is. I mean, as Judge Freeland pointed out, that could be simply somebody fleeing. I mean, if I heard shots, I might get in my car and flee, too. Which is what the caller did. Which is what he did, exactly. And it's also a little odd to me that if somebody were, in fact, involved, that they would follow a potential witness. I don't know. The oddness is not a great argument for you, because they do find the gun in the car later, and it's warm. So, I mean— Well, I think there's— Yeah. In other words, odd things happen. I think there's other problems with that, Your Honor, yes. Yeah, but what I'm saying is, you have to view reasonable suspicion at the time it occurs. Exactly. Not that it turns out to be odd, because your client may well have been the shooter. Well, that was never proven. In fact, no shooting was ever shown to have occurred. Repeatedly, they say we found no evidence of shooting, no victims, no witnesses. So, if I may, I'd like to reserve the balance of my time, please, Your Honor. Well, just the gun— One of your arguments is that they introduced evidence that the gun felt warm. The gun? That's right. And you argue that it's prejudicial. I think that it was— That would be some evidence that the gun was fired. 404B, other acts, evidence, Your Honor. And the district court, I think, acknowledged that it was not part of the same incident that was involved here. It was an other act. I want to contrast this case from cases where some kind of a shooting or some misconduct with a gun was actually found to be part of the same incident. Those are felon in possession cases where the possession is actually based upon possession during an assault, like the officers come upon the person assaulting somebody with a gun, and they say, because we saw you assaulting somebody with this gun, you are a felon in possession. That's not our case here. Flores was not ever shown to be engaged in any kind of misconduct with a weapon. It's purely based upon that stop. So that was 404B, other acts, evidence. And I think the question is, was that inextricably intertwined under Vizcarra-Martinez with the stop in this case? And I think it was not, Your Honors. It was not part of the same incident, and it wasn't necessary to put that information into the record in order to show that he knowingly possessed the gun or the ammunition. Could I ask you one last question? Yes, sir. Tinted windows. Was any question ever asked about whether the car that was stopped, your client's car, had tinted windows? Your Honor, I'm not aware of anything in the record. I viewed the tape, and I couldn't tell that the windows were tinted, Your Honor. Suppression Exhibit 9, I almost think I can see through the back window. Flores's actual front window is rolled down, so you can't see that, but there's a window right behind him, and I couldn't tell that that window was tinted, Your Honor. The government in this case has now indicated it's not relying on any description of the people inside the car. No, Your Honors, and also I'd like to point out, I don't think that the officers thought that the car had tinted windows either. I don't think the helicopter, the helicopters certainly couldn't see if the windows were tinted, and the officers never claimed to have seen that they were tinted, so I don't think that's something they relied on. But nobody asked about it.  I'm not aware of that, Your Honor. You've exceeded your allotted time. Thank you. Thank you, Your Honor. If necessary, we may give you a minute for rebuttal. Thank you, Your Honor. Let's see how the argument goes. Good morning, Your Honors, and may I please record Kevin Reedy on behalf of the United States. Your Honor, I do, I think it's important to begin with the ongoing, I think it was reasonable for the officers to infer that there was an ongoing emergency situation involving an active shooter in San Pedro. Based on the 9-1-1 calls that it received, the volume of the calls and the descriptions of the shots that were given, there were two calls that were received, one at 2-09 and one at approximately 2-10, describing shots fired at the time of those calls at 14th and Pacific. Then there was another call that was made approximately 2-10 from yet another security guard who reported a shooting at 5th Street, also I believe near the intersection of 5th and Pacific. It was not clear whether that call was made, whether or not that was a contemporaneous, directly contemporaneous description of the shots. It could have been the shots that were made earlier than the 14th and Pacific, than the 14th and Pacific shooting. Finally, there's another call that comes in at 2-24 a.m. from the security guard that we mentioned who seemed to have left his place. Does the 2-24 call explain when the shots were heard? The caller said that he, I believe that he was contacted by the 9-1-1 dispatcher after having made an initial call. Right, so he called, he initially called earlier. Yes, that's right, Your Honor. And so his call was not to say something's happening at 2-24. That's correct. His call was to say something was happening in rough proximity to the time of the other three calls. I believe it was, he was not exact, but I believe he said 10 to 15 minutes before the call. So that places these, at least the four calls that the district court cites, Yes, Your Honor. Roughly, describing roughly contemporaneous incidents. Possibly, Your Honor. Well, not possibly, you just told me the times. Yes, Your Honor, I suppose that if you're roughly 10 minutes within 5 minutes of each other, then yes, I think that that would be accurate. So, as to the first three callers, I mean, this case all turns on whether or not there's reasonable suspicion to stop this particular call. Yes, Your Honor. You don't contend that because there was an ongoing emergency, they could stop every gray car in the area, do you? I don't, Your Honor, no. Okay. So at what, what's the reasonable suspicion about this particular car? The only description of any car comes from the last caller who says, I didn't see a shooting, I just heard it, so I decided to leave town. I got in my car and behind me was a speeding gray car. Yes. It slowed down once it caught up to me. Your Honor, I believe. So why does that give us reasonable suspicion that the people in that car haven't engaged in the shooting? Your Honor, my understanding, just based on my recollection of the call itself, was that the security guard described that call, or that car as coming from the direction of where he heard the shots. And I think given the hour in which, and I think that Suppression Exhibit 9, I would respectfully disagree with the defense's position regarding what that video shows. I think the dashboard camera video shows that the traffic at 2 o'clock in the morning in San Pedro was very light. I assume all that to be the case. So he sees a car coming from the direction that he heard the shots. He has enough time, presumably after he hears the shots, to get out of his security post, get into his car, and start driving away. And he sees a car coming from that direction. Let's assume that all to be true. What is the reasonable suspicion that the people in that car did the shooting? Nobody previous to that describes a car. Two of them describe people not in cars. Somebody says, I think they may have gotten in a car afterwards. But that was, when they say they may have gotten in a car afterwards, that was how much before? That call, the third call, somebody says, I think they may have gotten into a car. I believe that was one of the calls reporting shots at 14th and Pacific. Okay, that's at 210. 210. Yes. And this guy sees somebody when? Depending on, I think if it's 10 or 15 minutes, either at 210 or 215. How far is it from one place to the other? I believe the distance between 14th and Pacific. And he said he was at 7th Street, but I believe he heard the shots coming from the direction of 6th Street. So approximately nine blocks. I have it in my brief, but I think that that's not, either around a mile or not much more than a mile, Your Honor. And at 2 o'clock in the morning, I do think that seeing a car come from the direction of the shots at a high rate of speed at a time when there's very little traffic, I think that the officers could reasonably infer that that car could have potentially been involved in the shooting. Couldn't the car just have been trying to get away from the shooting? I mean, which is, in fact, what the caller did? That's possible, Your Honor, and I don't want to say that it's the only reasonable inference to draw, but I do think it is a reasonable inference that the officers could draw. So let's assume the officers were actually standing on the corner when the security guard left. He got into his car and drove away quickly. Could they have stopped him? I'm not sure if they were still there. They don't have any description. Let's put aside his description of the car. Yes. They're just in the area and the security guard hears shots and he gets in his car and says, I'm boogieing, I'm going home. Can the officers stop him? Your Honor, if they were there at the scene. He's in the area of the incident, he's going fast, he's leaving. Can they stop him? I do think that if they're presented with a situation where members of the public are reporting an ongoing shooting.  This situation, I'm asking you a very specific question. Yes, Your Honor. All the facts in this case, can they stop the security guard? Immediately after hearing shots fired, I think that that would be reasonable, Your Honor. They didn't hear shots fired. They just got the three calls. The security guard, put aside the security guard's call. He doesn't make a call. They get all these calls, he hears shots, he gets in the car and leaves. The police officers see him driving away. May they stop him? Depending on how close they are to the reports of the shots, Your Honor, I do think that it would be reasonable to stop him. Therefore, under your theory, they may stop every car that they see in the area of the shots. Your Honor, I think that where I would at least try to clarify the court's hypothetical is with the area of the shots. Well, we know where the security guard left his post. We know where his post was. Yes. And we know where he saw the gray car. So may they stop every car that they see in that area? Your Honor, I think that the less information you have about the car, about a suspect's car, I think that the more you, the court would probably need to require a greater temporal and geographic proximity to the reports of the crime. See, that's my difficulty in this, so let me ask you to deal with it. It would be one thing if somebody on the scene said somebody shot, there were shots and somebody got into a gray car. And then somebody later down the road says, I see a gray car. Now we have, but all we have here are a bunch of people saying we heard shots and somebody later saying, I see a gray car behind me coming from the direction of the shots. So under your argument, that's enough. At 2 o'clock in the morning, Your Honor, with very few cars on the road, I think it's reasonable for the officers to infer that that car was not just an innocent bystander. I'm wondering about this assumption that there are few cars on the road. So it seems kind of like a reasonable assumption, but why wasn't it the government's burden to put in actual evidence of that? Like the hypothetical of the helicopter looking down. I mean, if there are only three cars on the road, maybe you can stop all three. But we don't know if there were only three cars on the road in L.A. I mean, maybe there were a lot of cars. Your Honor, I would suggest that the government did submit evidence. The dashboard camera video that was suppression exhibit 8 did show Officer Martinez's car patrolling the streets of San Pedro I believe in the 15 to 20 minutes before the stop of the defendant was made. That dashboard camera video does show very light traffic as one would expect. But it does show other cars. Yes, Your Honor. It does show other. I try to look at it. How many did this show? Do you remember? Your Honor, I did not count the number of cars. It wasn't just one or two. I believe so. I think that we would have to separate between different. I did not actually count the cars. And it's hard to tell whether they're gray or black. Yes, I do. I do think so. I do think, though, Your Honor, that the video does show, as one would expect at 2 o'clock in the morning, that there were very few cars on the road. I think some of the decisions that the defendant cites, Martinez and Jones, one of the key factors that the court relied on in finding that reasonable suspicion was not present in those cases. Some of them it's like 4 in the afternoon instead of 2 in the morning. Yes, Your Honor. What about Jacquez? I'm sorry, Your Honor? The Fifth Circuit case, Jacquez. Am I pronouncing it correctly? Yes, Your Honor. How do you distinguish that case? I think Judge Corman may have already done my work for me on that issue, Your Honor. He mentioned earlier that the description in that case was just a red car. And I think that one of the reasons that the court— Isn't that pretty much a description in this case? It's a gray car, a Camaro or a Challenger, I think. I think a gray—I would submit that the— It's a gray generic car, one of those little gray cars. I'm not sure that a Chevy Camaro is a generic car, Your Honor. So if this had been a Corolla? I think that we would have—we would probably have more difficulty if it were a Corolla or a Camry, Your Honor. Didn't the helicopter also mention the make of the car? I think that the helicopter did say that it reported a gray Chevy Camaro that was speeding when it spotted it. I believe that that was at 18th and Mesa. So that was the information that was provided. That was about 45 minutes after the incident? No, Your Honor. Not 45. Half an hour? No, Your Honor. I think that they spotted the car at approximately 227 in the morning. Okay. So that—but at that point, it was going back towards the area of the incident? Yes, Your Honor. That's correct. The witness had seen it going away from—speeding away from the incident? Yes, Your Honor. And you indicated that was a good reason to be suspicious of it. Now it's speeding back towards the incident. Is that a good reason to be suspicious of it? Your Honor, I think that it's not a reason to exclude that car from the officer's investigation of ongoing criminal conduct. I don't think that it is impossible to believe that the car was going back to return home. It's possible Mr. Flores did live in the area. And so I believe the dashboard camera video does show that the woman he was driving with also lived in the area. So that would have been a reason. Also, Your Honor, if we believe that, as the officers reasonably believed in this case, it's an ongoing active shooter situation, then the shooter could have returned to that area to engage in more targets or perhaps finish off the job that he already started. I'm happy to answer— I do have another question about the warm gun issue. Yes. I don't understand how the government was introducing the warmth of the gun for anything other than suggesting that he was the shooter. Can you try to explain to me what the purpose that's not related to that is? Your Honor, I think in this case, even if the defendant was not the shooter, the fact that the gun was warm was key evidence in the key disputed issue in the case. The defendant, in his opening statement, in his closing argument, and during his testimony, said that he was unaware that the gun was loaded. If the gun was—if the barrel of the gun was warm, that at a minimum suggests that the defendant had recently handled the gun, which would suggest that he was a greater familiarity with the gun, which would also suggest that he knew that it was loaded. Otherwise, the other inference that the court could draw was—or that the jury could draw was that he had fired the gun recently, perhaps not at the specific locations where the shots were fired. This was a case about prohibited possession of ammunition. Correct, Your Honor. And his defense was—I hate to say it, but his defense was, I didn't know the gun was loaded, which sounds like the defense you often hear. And so the notion was the warmth of the gun was evidence that he knew it was loaded. Yes, Your Honor. Of course, he showed it had recently been fired. Did the judge also allow evidence to explain—to suggest that there was an alternative explanation? Yes, Your Honor. I believe during the cross-examination of the officer, the defense attorney made the argument that the gun was warm because the officer had placed the gun on the hood of a running car. That hood of the car, obviously, because the engine was running, was warm. I think that was the suggestion that the defense attorney tried to make to the jury. And he—it wasn't just a suggestion. It was—he elicited that it was on top of the—whatever it was. Yes, Your Honor. That's correct. And the idea is that he was holding the gun and shooting the gun and therefore knows how many bullets are left in the gun? No, Your Honor. I think—I'm not sure that the government has to prove that the defendant knew exactly how many bullets were left in the gun, but the government did have to prove that he knew at the very least that it was loaded. If the defendant had held and fired the gun, it does suggest that he was—he had handled the gun recently. But it seems like part of the—I mean, it does seem like part of the inference you're trying to use is that he must have been firing the gun, which I thought the district court was trying to not let you argue. So I just think this issue got kind of muddled, but maybe I'm missing something. That's possible, Your Honor. I think that the district court did say that we could get into the fact that there was a shooting and that we were investigating the shooting. I think that the limitation—I think that we were—the government was permitted to at least perhaps create the possible inference in the juror's mind about that. At least that it's difficult to—it was an oral ruling, and I understand that it may have gotten a little bit muddled in the expounding of it. Can you tell whether a gun is loaded by holding it? No, Your Honor. I think that the idea would be that if he had held it recently and handled it, it's more likely that he was more aware about the contents of the gun. If, as the defendant tried to tell during his testimony, he had merely picked the gun up off the street a couple of days ago and just stashed it underneath his driver's seat, I think it's less likely that he would have known about the contents of the gun. However, if he had handled it recently, if he had had it into his hands, I think the jury could infer that that suggests a greater familiarity with the gun and its contents, whether or not it was loaded. No other questions from the panel? Thank you, Your Honor. Thank you. We've taken you both over time. I'll give you one minute for rebuttal. Thank you, Your Honor. The government exactly presented evidence of the gun's warmth to try to show that it had been fired recently. That is put expressly into its opposition to the motion in Lemonade to exclude evidence of the gun warmth. It said we need to show that he shot the gun to show that he knew it had bullets in it. In the extricably intertwined analysis, that is not correct.  there were bullets in the gun. Flores was asked how many bullets are in there. He said eight, four, three, four. He said he knew it. He was heavily impeached. He testified at trial about his knowledge that the gun was in the car. You know, there was ample evidence the government could have put in to show that he knew that the gun had bullets in it without showing that he was a shooter. And when I think you combine that with the statement that was improperly introduced in violation of the motion in Lemonade, saying callers came out all over town and they described your car, which was not true, you put that together with evidence that the gun was warm and the inference that he was a shooter, and I think this trial really became about something else. It became about whether Mr. Flores had committed a shooting. And I don't think the district court was correct in ruling that it could introduce gun warmth evidence. I think the district court understood this was a 404B other incident, and I think the ruling was muddled, and I think it was really erroneous, Your Honors, under N.D. standard. Thank you. Oh, wait, wait. Judge Korman has a question for you. How do you define reasonable suspicion? A particularized and objective basis to suspect that a particular individual was involved in criminal activity. That's from Navarrete, Your Honor. And Professor Capra, in his book, says it is appropriate to think of reasonable suspicion as possible cause. Do you accept that? I think that's just too general, Your Honor. Anything is possible, Your Honor, and I think that the only cases that address this kind of a situation where it's a make, color, model of a car, and it's possible that it could be the shooter's car, it's possible it could be where it was found in the time that's passed. Jacquez, Belton, Martinez, and Jones reject that. It's possible, but that's simply not enough for a particularized and objective basis for suspecting a particular person or car. I also want to point out Exhibit 3, Suppression Exhibit 3. The caller who speaks Spanish calls twice, and he says, there are people running from the nightclub. They're running and running. And the second call is in Spanish. He says, they're at my door. They're trying to get in now. Lots of people were running away from these shootings, Your Honors. One of them happened to have a gray car. It's possible it could have been Mr. Flores's, but it's certainly possible that it wasn't. Professor Capra, it happens to be a Ninth Circuit case where I think a bank robber ran into a hotel with 40 rooms, and the court suggested there wasn't probable cause to search, at least at the outset, each of the 40 rooms, but there was reasonable suspicion. Reasonable suspicion to search each of the 40 rooms, Your Honor? To start with the first one, because as you went through it, you either found it the first time, or if you didn't find it, the odds, then there were only 38 rooms. Then there were only 37. So the odds, shall we say, increased. But at the outset, it was a 1 in 40 chance. Maybe so, Your Honors. I think that's a pretty different situation from what we have here. I think Belton talks about a car. I understand it deals with cars, but there's a lot of discussion about all of this without specific reference to what constitutes reasonable suspicion. I think in the car context, the facts we have here are not sufficient. Your Honors, if I may just also point out. No, you may. The exhibit may not work, Your Honors. You're 2 1⁄2 minutes late. If I let you do your May, we'll be 5 minutes late. I'm happy to submit the CD if Your Honors need to. That's all I was going to say. It may not work. Thank you, Your Honors. We thank both counsel for the excellent briefing and arguments in this case. This case will be submitted.
judges: Hurwitz, Friedland, Korman